Argued and submitted May 2, reversed and remanded for reconsideration August 17, reconsideration denied September 30, petition for review pending 1988

## AUDUBON SOCIETY OF PORTLAND et al,
### *Petitioners,*

*v.*

## LAND CONSERVATION AND DEVELOPMENT COMMISSION,
### *Respondent,*

## BENTON COUNTY
### *Intervenors - Respondents.*

(LCDC 87-ACK-215; CA A43921)

760 P2d 271

Douglas M. DuPriest, Eugene, argued the cause for petitioners. With him on the brief was Hutchinson, Anderson, Cox & Teising, P.C., Eugene.

Linda DeVries Grimms, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Jeffrey G. Condit, Corvallis, argued the cause and filed the brief for intervenor-respondent Benton County.

William J. Moshofsky, Portland, filed the brief for intervenor-respondent Alan Dapp.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Petitioners seek review of LCDC's acknowledgment of the parts of Benton County's comprehensive plan and land use regulations which relate to the Jackson-Frazier Wetland.[1] Petitioners argue that the county provisions violate Goal 5 and OAR 660-16-000 *et seq.* We agree and reverse.

The affected area consists of approximately 158 acres and contains a unique combination of plant species. Intervenor Dapp is the owner of approximately 117 acres in the Wetland. All parties agree that the area is a "resource site," subject to Goal 5, and it has been included as such on the county's Goal 5 inventory. Because of the soil classification in the area, Goal 3 requires that it be treated as agricultural land, and the county has included it in an exclusive farm use (EFU) zone. The county's attempts to apply Goal 5 to the Wetland, and to satisfy LCDC that it has complied with the goal, date from early in the decade. The dilemma which the county has faced is that, if it adopts the kind of Goal 5 program which petitioners espouse and LCDC's earlier orders in the compliance review process suggested might be required, there is a possibility that Dapp will be deprived of all economically feasible use of his Wetland property. The county has attempted to escape the dilemma by submitting a measure to the voters to fund its acquisition of the property and by encouraging negotiations between Dapp and the Nature Conservancy, whereby the latter would buy the land. Neither attempt succeeded.

In November, 1985, Dapp undertook draining and related activities on the Wetland. Those activities were greeted with disfavor by the Oregon Division of State Lands (Division), the federal Environmental Protection Agency (EPA) and the United States Army Corps of Engineers (Corps), because Dapp had no permit for draining or filling operations from the Division pursuant to ORS 541.605 *et seq,* or from the federal agencies pursuant to the Clean Water Act. *See* 33 USC § 1344. The agencies directed him, in essence, to

---

[1] The county's plan and regulations have been acknowledged in other respects by LCDC. The Wetland was "segmented" for further county proceedings and LCDC review in 1984. The order under review and our decision relate only to the compliance of the Wetland with the statewide goals. *See* ORS 197.251(6),(7) and (10).

restore the status quo. Insofar as the parties apprise us, Dapp has not applied for a permit.

The county submitted its current plan and regulations to LCDC in November, 1986, and LCDC acknowledged them in early 1987. They were not changed in material respects from the documents which the county had previously submitted and LCDC had previously rejected. The county's wetland protective program in its plan included general policy statements and a statement of intent to cooperate with the state and federal agencies. The county's only regulatory measure for implementing its plan policies is the EFU zoning of the area. The county maintains that the limitations on the uses which are permissible in the EFU zone, along with the low likelihood that the allowable uses which might harm the resource will actually take place, assure adequate protection of the wetland site.

Goal 5 and OAR 660-16-005 require that, after a resource site is inventoried, "[i]t is the responsibility of local government to identify conflicts" with the site. The rule defines a "conflicting use" as "one which, if allowed, could negatively impact a Goal 5 resource site." If no conflicting uses are identified, the "jurisdiction must adopt policies and ordinance provisions, as appropriate, which insure preservation of the resource site." OAR 660-16-005(1). If conflicting uses are identified, the county must conduct economic, social, environmental and energy (ESEE) analysis to assist in its adoption of a conflict resolution program.

■      The county concluded that there were no uses that would conflict with the resource site. It reasoned that the Wetland

"would have to be drained and cleared to improve the site before economically feasible agricultural use becomes possible. As the County has learned from the enforcement actions taken by [the Division, EPA and the Corps], the federal and state regulations regulate and effectively prohibit ditching and drainage of the wetland. If the site cannot be prepared for economically feasible agricultural use, then cultivational activities, such as application of herbicides, fertilization, introduction of non-native species, etc., are also effectively prevented.

"* * * The Board finds that a use that has merely the

potential to harm the Goal 5 resource, but which is not reasonably likely to occur, does not 'conflict' with the preservation of the Goal 5 resource.

"Goal 5 does not mandate that the county, by ordinance, directly forbid all potential conflicting uses no matter how remote the likelihood of the conflicting use ever occurring."

LCDC states in its brief that the "County's plan stands or falls based on its initial assumptions and application of the 'conflicting use' aspect of Goal 5." Petitioners argue that the county's approach, which LCDC approved, stands the "Goal 5 process on its head" and defines the conflicting uses away. We agree with both parties' statements.

The threshold problem with the county's reasoning is the significance that it attaches to the "enforcement actions" by the Division and the two federal agencies. The county relies on the statement in *1000 Friends of Oregon v. LCDC (Tillamook Co.)*, 303 Or 430, 439-40, 737 P2d 607 (1987):

"It thus fairly could be argued that the only issue before us is a very narrow one: whatever the extent of its authority may be, is it *legally permissible* for the county to fulfill its planning responsibilities by deference to the [state agency's] administration of the [Forest Practices Act (FPA)]? * * * The FPA itself is supposed to be administered in conformance with, *inter alia,* Goal 5 [citing ORS 197.180 and other statutes]. Nothing in the text or context of [*former*] ORS 527.722 or 527.726 suggests to us that a county is *foreclosed* from the option of reliance on the FPA in meeting the county's Goal 5 obligations. The county was entitled to do so." (Emphasis in original.)

The county argues that the Division, like the state agency charged with administering the FPA as it read at the time of the *Tillamook Co.* decision, must comply with the statewide planning goals. However, the FPA established what was principally a regulatory scheme for commercial forestry operations; by contrast, as relevant here, the principal function of the agencies is the administration of permit programs. The county acknowledges as much, but states:

"If the state and federal agencies had never become involved with the Jackson-Frazier Wetland, the County might be forced to agree with petitioners that the County could not definitively conclude, based on the language of the regulations alone, that draining and filling is prevented on the

Jackson-Frazier Wetland. The County bases its finding not only upon the language of the regulations, however, but also on the record that these agencies have developed specifically regarding the Wetland."

However, the agency communications and other parts of the record to which the parties point do not support a "definitive conclusion" that the agencies will not permit draining or filling operations in the Wetland in response to a future permit application. They demonstrate only an abstract likelihood, amply cushioned with caveats, that, if an application were pending before the agencies, there would be many impediments to its approval.

Another significant difference between this case and *1000 Friends of Oregon v. LCDC (Tillamook Co.), supra,* is that the basic issue there was the extent to which the FPA *permitted* counties to exercise land use planning responsibilities over land zoned for commercial forestry or, conversely, made the state agency regulatory program exclusive. The court's answer was that the FPA largely preempted county regulatory authority. Under ORS 541.605 *et seq,* however, local land use planning authority is not merely left undisturbed; ORS 541.625(3)(g), which was amended by Oregon Laws 1987, chapter 70, section 1, to replace its materially similar predecessor, requires the director of the Division, in acting on an application, to consider whether the proposed fill "is compatible with the acknowledged comprehensive plan and land use regulations for the area." The situation is something akin to a conflict of laws renvois.

The case which is most analogous is *1000 Friends of Oregon v. LCDC (Hood River Co.),* 91 Or App 138, 754 P2d 22 (1988), where we rejected the contention that the county's standards for allowing a conflicting conditional use in a resource area where it was ostensibly prohibited were so restrictive that, as a practical matter, the county could not grant a permit for the use after its plan and regulations were approved. We concluded that, rather than measuring goal compliance as of the time of acknowledgment, the county and LCDC had incorrectly based their decisions "on a hypothesis about how the county will apply the ordinance in the future" and "on the basis of a speculation that a facially noncomplying provision may be applied consistently with the goals and

LCDC's rules." 91 Or App at 142; *see also 1000 Friends of Oregon v. LCDC (Morrow Co.)*, 88 Or App 517, 746 P2d 238 (1987). Here, the county's understanding that draining and filling will not occur is also based on a speculation, and one which is attenuated by the fact that it pertains to how *other* entities will apply *other* bodies of law, in the absence of any identification or regulation of conflicting uses in the county's plan and regulations.

■ LCDC and the county also argue that it would border on the absurd for local governments to have to consider all conceivable uses, however improbable their occurrence might be, in delineating conflicting uses for purposes of Goal 5. Assuming that to be correct in the abstract, it is not a compelling argument here for two reasons: first, the number of potential uses allowed or allowable in an EFU zone is finite and defined, and the potential for conflict with a resource site is readily ascertainable; and, second, the incorrectness of the county's assumption that draining, filling and clearing are virtual impossibilities negates its hypotheses about how "economically feasible" and probable it is that conflicting uses will be conducted in the Wetland now or in the future.

■■ As an alternative to its "no conflicts" approach, the county also provided LCDC with what purported to be an ESEE analysis. That analysis, as explained in LCDC's brief,

> "identifies 32 uses which potentially conflict with the identified resource values and which are permitted under the current EFU zoning. For each of those uses, the county describes why the use (1) would not harm the resource; or (2) is prohibited by a state or federal regulation; or (3) is 'highly unlikely to occur.'"

That is simply redundant of the "no conflicts" approach in a different guise and suffers from the very defects that we have described in our discussion of that approach.[2]

---

[2] Moreover, the county's ESEE exercise is circular. The requirement that ESEE consequences be analyzed arises only when there are identified conflicting uses, and the principal purpose of the ESEE analysis is to serve as the basis for the planning jurisdiction's conflict resolution decisions and program. *See* OAR 660-16-005, OAR 660-16-005(2), OAR 660-16-010. If there are no uses which conflict with the resource, the "jurisdiction must adopt policy and ordinance provisions, as appropriate, which insure preservation of the resource site." OAR 660-16-005(1). That requirement is applicable, regardless of whether a planning jurisdiction concludes before or after it undertakes ESEE analysis that there are no conflicts to resolve.

The county has not followed the process that Goal 5 and OAR 660-16-000 *et seq* require. It has not treated identifiable and apparent conflicting uses as being such or undertaken the necessary analysis, conflict resolution and program development that would follow from their identification. The county has essentially avoided the process by assuming that a chain of future events, beyond its control, will occur and might serve to prevent or limit conflicting uses without regulatory intervention by the county. We agree with petitioners that the process the county has followed does not satisfy the goal and the rule.

Petitioners also argue that, in addition to the procedural defects, the substance of the county's wetland regulations is inadequate and incorrect. Petitioners strongly imply that the county *must* adopt a program which protects the Wetland fully and prohibits all conflicting uses. *See* OAR 660-16-010(1). LCDC and the intervenors respond that neither LCDC nor we may dictate that the county adopt any particular Goal 5 program. We need not resolve those questions now. Our holding that the county has not followed the Goal 5 process, as it must, means that, as of this time, we do not know what the substance of its program will eventually be. For the same reason, we need not address intervenors' arguments that particular forms of regulation might constitute a constitutional taking of Dapp's property. Assuming that those arguments could be cognizable in an acknowledgment proceeding, they cannot be considered until the county has completed the process necessary to adopt its regulations and their nature is known.[3]

Reversed and remanded for reconsideration.

---

[3] In addition to their assignment that LCDC erred by concluding that the county has complied with the goal and the rule, petitioners contend through a separate assignment that the acknowledgment was inconsistent with LCDC's earlier positions in its compliance review of the county, and that the inconsistency was not explained. ORS 183.482(8)(b)(B); *see 1000 Friends of Oregon v. LCDC,* 72 Or App 443, 696 P2d 550, *rev den* 299 Or 584 (1985); *Coats v. LCDC,* 67 Or App 504, 679 P2d 898 (1984). Our disposition of the first assignment makes it unnecessary to reach the second.